Opinion issued April 29, 2010

 



 

 

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-08-00141-CR

NO. 01-10-00280-CR

NO. 01-10-00281-CR

NO. 01-10-00282-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



THOMAS OTIS PALMER, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 23rd District Court[*]

Brazoria County, Texas

Trial Court Cause No. 47165

 

MEMORANDUM OPINION

 

          A jury convicted appellant
Thomas Otis Palmer of four counts of aggravated sexual assault of a child
(01-08-00141-CR, Count 1; 01-10-00280-CR, Count 2, 01-10-00281-CR, Count 3;
01-10-00282-CR, Count 4), and the trial court assessed punishment at
confinement for 80 years on each count, to be served concurrently.  See
Tex. Penal Code Ann. § 22.021
(Vernon Supp. 2009).  In two issues,
Palmer argues that (1) the evidence was factually insufficient to support the
jury’s verdict and (2) the trial court violated his constitutional rights to
confront his accuser by preventing him from cross-examining a child complainant
about a prior, unrelated sexual abuse outcry. 


          We affirm.

Procedural History

          This appeal relates to
charges that appellant Palmer sexually abused three child complainants—C.M.,
L.M., and L.G.  The conduct at issue was
alleged to have occurred in or around April 2003.  The youngest complainant, C.M., was four
years old at the time of the alleged conduct. 
L.M. was seven years old at the time, and L.G. was twelve.

          In April 2004, sexual abuse
charges against Palmer relating to all three child complainants were presented
in a consolidated trial.  The jury could
not reach a verdict, and the trial court granted a mistrial. 

In March 2005, Palmer was tried on charges
relating to L.M. only, and the jury convicted him of aggravated sexual assault
of a child and indecency with a child by exposure.  Palmer
v. State, 222 S.W.3d 92, 93 (Tex. App.—Houston [14th Dist.] 2006, pet.
ref’d) (Palmer I).  During cross-examination of L.M. in the 2005
trial, the defense elicited testimony that L.M. previously accused her mother’s
female friend of sexually assaulting her. 
Id. at 94.  In some respects this earlier outcry was
factually similar to the accusations L.M. made against Palmer.  Id.
 The trial court instructed the jury that
it could not consider the evidence about the earlier sexual assault accusation
unless it found beyond a reasonable doubt that the earlier accusation was
false.  Id. at 95.  The Fourteenth
Court of Appeals observed that the trial court found “some evidence of falsity”
of the earlier accusation when it admitted the evidence for purposes of
cross-examination.  Thus, the court of
appeals held that there was egregious jury charge error, reversed the
conviction, and remanded the cause for a new trial.  Id.
at 96.  

After remand, in November 2007 Palmer was tried in
another consolidated trial on all charges pertaining to C.M., L.M., and
L.G.  The jury acquitted Palmer of all
charges pertaining to L.M. and L.G., but the jury found Palmer guilty on four
counts of aggravated sexual assault against C.M.  Palmer appeals these four convictions.

Factual Background

References
to trial testimony in this factual background section refer to testimony at the
November 2007 trial, which resulted in the convictions from which Palmer
appeals.  Jill, the mother of C.M., L.M., and L.G., met Palmer in 2002 through a
mutual friend.  From late 2002 until
April 2003, Jill and her three children lived together in Brazoria County
with Palmer and his daughter, D.P. 
During this time frame, C.M., L.M., and L.G. were aged approximately
four, seven, and twelve, respectively.

According to Jill and L.G., on the night before Easter
Sunday 2003, Palmer took L.G. for a ride in his truck.  When they returned approximately six hours
later, L.G. went straight to bed, and Palmer told Jill that they had been
delayed from their errand because his truck broke down.  At trial, Palmer denied going anywhere with
L.G. that night.  

On the Thursday following Easter, L.G. told her
mother that Palmer had taken her to the beach, forced her to inhale cocaine,
and raped her in his truck.  After L.G.’s
outcry, C.M. told her mother that Palmer had been physically and sexually
abusing her.  L.M. later came forward
with additional allegations against Palmer.

With the help of a neighbor, Jill took her children
to the home of Palmer’s father, where she spoke to Palmer’s step-mother, Jenny
Palmer.  Jill then took her children to a
women’s shelter.  Jenny testified at
trial that she was aware of L.G.’s allegations against Palmer.  Jenny said that she questioned L.M. and C.M. and
they both denied that Palmer had touched them inappropriately.  At trial, C.M. testified that she did not
remember these conversations with Jenny, and L.M. testified that she vaguely
remembered Jenny but did not really know her. 


At trial, C.M. testified that her mother had told
her to be brave but did not tell her what to say.  C.M. testified that Palmer touched her
“private parts” and “boobs.”  She said
that he put his fingers inside her “private parts,” “stuck his fingers in [her]
butt,” made her “suck on his private part,” and touched her “private part” with
his “private part.”  C.M. testified that
when Palmer penetrated her mouth, “he told me not to bite hard.”  C.M. testified that the abuse occurred
privately, “in the closet with him with the lights turned off.”  She also testified that “white stuff came
out” and went into her mouth.  Although
she could not see in the dark closet, C.M. said she knew it was “white stuff”
because she had seen it on a prior occasion or she must have spit it out and
seen it on her hand.  C.M. also testified
that she could not remember which house the alleged abuse took place in or what
Palmer’s penis looked like.

On cross-examination, C.M. agreed with nearly all of
the defense attorney’s statements suggested in the form of leading questions,
effectively denying that any abuse had occurred.  She agreed that she had previously “sort of
rehears[ed]” her testimony in the courtroom. 
She agreed that in conversations with her mother and with Jenny Palmer she
had previously denied any sexual abuse, that she was telling the truth when she
did so, and that her mother had told her “the white stuff business” and “the
story about the dark closet.”  On
redirect examination, the prosecutor asked her why she agreed with the defense
attorney’s statements, and C.M. responded, “Because I thought I had to.”  C.M. testified that she denied sexual
molestation while she lived with Palmer out of fear of further abuse.  

L.M. testified that Palmer once exposed himself to
her and once fondled her “private part” with his hand.  L.M. said that C.M. was in the room at the
time of the molestation and that Palmer then took her to the kitchen to eat
cereal.  

L.G. initially refused to testify because she did
not want to talk about the incident again. 
After the trial court admonished her that she had been subpoenaed and
could be held in contempt of court, L.G. reluctantly testified.  L.G. repeatedly answered questions by saying
that she did not know, did not remember, or did not understand the
question.  However, L.G. also testified
that Palmer drove her to the beach and made her remove her shirt and shorts and
go swimming.  When they returned to
Palmer’s truck, Palmer cut her panties off with a knife, performed oral sex on
her, and raped her.  L.G. said that
Palmer warned her not to tell her mother about what happened.  

The children’s mother, Jill, testified that she had
observed changes in her children’s behavior, particularly C.M., who frequently
had bruises and injuries.  In early
April 2003, Jill observed some inflammation to C.M.’s perineum, the region
between her anus and genital area.  At
trial, Jill said it was “very abnormal” and that it was “like a hemorrhoid or
even worse it was turned the wrong way out.” 
When Jill asked C.M. about it, C.M. said she did not know what
happened.  Jill testified that C.M. said she
would not tell her mother if Palmer had hurt her.  According to Jill, Palmer later looked at the
inflammation and spoke with C.M. alone. 
C.M. then told her mother that she had injured herself by trying to
insert a tampon.  Jill testified that
Palmer threatened to kill her when he learned that Jill had asked C.M. if
Palmer had touched her inappropriately. 
According to Jill, Palmer refused to let her take C.M. to a doctor.

          After reporting the
alleged abuse to police, the children underwent medical examinations.  L.M. was examined at the Children’s
Assessment Center in Houston.  Records of
L.M.’s examination stated that there was no physical or anogenital trauma,
noting: “Normal exam neither confirms nor denies allegations of sexual abuse.”

L.G. was examined at the Children’s Assessment
Center, Texas Children’s Hospital, and the ABC Clinic at The University of
Texas Medical Branch at Galveston (UTMB). 
Dr. James Lukefahr, who examined L.G. at UTMB, noted that the
examination was abnormal and consistent with acts described by her and the time
lapse since the alleged last incident of abuse. 
Some of the
details in the narrative taken by the UTMB social worker differed from the
trial testimony by L.G. and her mother and from other accounts of the alleged
assault against L.G. (as found in the other medical records).  Both L.G. and her mother testified that the
social worker must have made some mistakes in transcribing the narrative.  The social worker died before trial and did
not testify.  

The State introduced C.M.’s redacted medical records
from UTMB without objection.  The defense
introduced C.M.’s redacted medical records from Texas Children’s Hospital.  These records showed that C.M. was examined
at UTMB and Texas Children’s Hospital. 
According to the UTMB records, Jill reported that C.M. was “very scared,
very angry, staying to herself, impatient, demanding, very hard to deal with
sometimes.”  C.M. experienced burning
when she went to the bathroom and distortion of her stomach, and she had a
history of rectal pain, diarrhea, vomiting, and bleeding in the anal area.  Jill told the social worker that C.M. had not
experienced vaginal bleeding or urinary tract infections.  In a separate UTMB record labeled “Child
Abuse/Neglect Protocol,” the pediatric resident, Dr. Bishawn Morris,
reported the following “history of abuse/neglect” for C.M.:

Per mom, [C.M.] has been
abused sexually and physically since August 2002.  However [C.M.] did not inform her mother
until April 24, 2003 when . . . [her] older sister told her mom that she
was sexually abuse[d] by mom’s boyfriend—Thomas Palmer.  Per mom, [C.M.] told her mom that [Palmer]
put his fingers in her rectum, made her cut all of her hair off, forced her to
perform oral sex on him, placed dog feces within her panties, poked her eyes,
submerged her face and body in scalded water, tied her feet with jumper cables,
and only allowed her to eat green beans or hot peppers. . . . .  Per mom, [C.M.] did not report vaginal
penetration however she often stops talking about the incident.  Per mom, [C.M.] tells her small bits of
information daily since they have been at the shelter.

 

The UTMB records also indicate that C.M. had been acting out sexually
toward her sister L.M. during their baths. 
Dr. Lukefahr reported a defect in C.M.’s perineum, noting: “The concave
defect in the midline of the perineal body is best explained in my opinion as a
healed penetrating injury and is highly consistent with the history of rectal
pain and bleeding.”  

Records from Texas Children’s Hospital showed an
obvious bruise on C.M.’s lower leg and blunt trauma to C.M.’s left hand with
swelling of one finger.  Texas Children’s
Hospital did not report any evidence of anogenital trauma or the perineal
abnormality, and its records reflected that the rectal exam revealed an “anal tag” and no lesions,
tears, or discharge.  However, Dr. Lukefahr testified that
UTMB had equipment that Texas Children’s Hospital lacked, specifically a
colposcope, which allows for a closer look at the child’s body while conducting
a sexual assault examination.

Dr. Lukefahr testified at trial that he examined
L.G. and C.M. at UTMB.  He described the
abnormality in C.M.’s perineum, which he believed to be healed trauma from a
penetrating injury, probably non-accidental. 
He testified that the findings of his examination were consistent with
the acts of sexual abuse that C.M. alleged and the time lapsed since the last
alleged incident of abuse.  However, he
also conceded that “in general, in children, the exams are not either [sic]
normal or not specific enough to be able to conclude who the perpetrator was or
when something happened with certainty. 
In other words, a lot of that information really relies on the history.”


Dr. Lukefahr also testified that he found evidence
of healed, penetrating trauma to L.G.’s vaginal vestibule, but no tearing or
laceration of her hymen.  L.G. reported
no bleeding as a result of the alleged assault, which was inconsistent with
Dr. Lukefahr’s expectation, but he also acknowledged that “a lot of girls
do not report bleeding even when a physical exam would strongly indicate they
probably had had some,” and “there is a possibility that [L.G.] did have a
little bit of bleeding which, for whatever reason, she didn’t notice or she
didn’t pay any attention to.”  He could
not rule out that the abnormality he observed on L.G. was actually a normal
variation.  

Palmer testified and denied all the allegations of
sexual abuse.  He admitted being abusive
to the child complainants’ mother, confessing to hitting her one time with a
closed fist.  Palmer testified that he
and Jill fought frequently and that Jill fabricated the allegations against
him.  He mentioned her history of writing
bad checks to bolster his theory of fabrication.  He testified that her motives for fabricating
the allegations were revenge and her desire to live for free at a women’s
shelter.

Factual Sufficiency

Palmer’s Contentions

In
his first issue, Palmer contends that the evidence was factually insufficient
to support his conviction for aggravated sexual abuse.  Palmer’s argument rests on the circumstance
that the same jury that convicted him on sexual abuse charges relating to C.M.
also acquitted him on similar charges relating to L.G. and L.M.  Palmer reasons that because Jill testified in
support of all of the charges involving her three children, the jury’s verdict
of acquittal on charges relating to L.G. and L.M. indicates that the jury found
each of Jill, L.G., and L.M. to be entirely not credible.  

Palmer
thus contends that no reliable evidence exists within the record to support the
conviction on charges relating to C.M. 
In addition to his premise that the jury necessarily rejected all
testimony from Jill, L.G., and L.M., Palmer also argues that the testimony of
Dr. Lukefar was only neutral with respect to whether Palmer committed an
offense.  Finally, Palmer argues that for
various reasons the testimony of C.M. herself was “tainted” and not worthy of
being credited.

Standard of Review

In
a factual sufficiency review, we view all of the evidence in a neutral light. Ladd v. State, 3 S.W.3d 547, 557 (Tex. Crim.
App. 1999).  We will set the verdict
aside only if (1) the evidence is so weak that the verdict is clearly wrong and
manifestly unjust or (2) the verdict is against the great weight and
preponderance of the evidence.  Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim.
App. 2000).

Under
the first prong of Johnson, we cannot
conclude that a conviction is “clearly wrong” or “manifestly unjust” simply
because, on the quantum of evidence admitted, we would have voted to acquit had
we been on the jury.  Watson v. State, 204 S.W.3d 404, 417
(Tex. Crim. App. 2006).  Under the second
prong of Johnson, we cannot declare
that a conflict in the evidence justifies a new trial simply because we
disagree with the jury’s resolution of that conflict.  Id.
Before finding that evidence is factually insufficient to support a verdict
under the second prong of Johnson, we
must be able to say, with some objective basis in the record, that the great
weight and preponderance of the evidence contradicts the jury’s verdict.  Id.  In conducting a factual sufficiency review, we
must also discuss the evidence that, according to the appellant, most
undermines the jury’s verdict. See Sims
v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

In
reviewing the factual sufficiency of the evidence, appellate courts should
afford almost complete deference to a jury’s decision when that decision is
based upon an evaluation of credibility.  Lancon
v. State, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).  The jury is in the best position to judge the
credibility of a witness because it is present to hear the testimony, as opposed
to an appellate court which relies on the cold record.  Id.  The jury may choose to believe some testimony
and disbelieve other testimony.  Id. at 707.  Thus, the jury is the exclusive judge of the
credibility of the witnesses and the weight to be given their testimony.  Id.
at 705; Tex. Code Crim. Proc. Ann.
art. 36.13 (Vernon 2007) (“Unless otherwise provided in this Code, the jury is
the exclusive judge of the facts, but it is bound to receive the law from the
court and be governed thereby.”).  Moreover,
the testimony of a child complainant, if believed by the jury, is factually
sufficient to support a conviction for sexual assault.  Tex.
Code Crim. Proc. Ann. art. 38.07 (Vernon 2005) (sexual assault conviction
is supportable on uncorroborated testimony of victim of sexual offense 17 years
of age or younger); Perez v. State,
113 S.W.3d 819, 838 (Tex. App.—Austin 2003, pet. ref’d), overruled on other grounds by Taylor v. State, 268 S.W.3d 571, (Tex.
Crim. App. 2008); Tear v. State, 74
S.W.3d 555, 560 (Tex. App.—Dallas 2002, pet. ref’d).

Analysis

As
alleged in the indictment, the State charged Palmer with aggravated sexual
assault of C.M. by penetration of C.M.’s sexual organ and anus with his finger
(counts two and four), by penetration of C.M.’s mouth with Palmer’s sexual
organ (count one), and by contacting C.M.’s sexual organ with his sexual organ
(count three).  See Tex. Penal Code Ann. § 22.021. 
In support of these allegations, the State presented, among other
things, testimony from C.M. that she was abused by Palmer, corroborating
testimony from C.M.’s mother and sisters, and corroborating medical testimony
from her examining doctor, Dr. Lukefahr.

1.       Testimony of complainant.—C.M. testified that Palmer touched her “private parts” and “boobs,” put
his fingers inside her “private parts” and her “butt,” made her “suck on his
private part,” and touched her “private part” with his “private part.”  C.M. testified about the details of
the abuse, including statements that Palmer told her not to “bite hard” and
that “white stuff” came out and went into her mouth.  

Palmer
would have us entirely disregard the testimony of C.M.  He contends that her testimony was “tainted”
and cannot be given full credit, due to multiple interviews of C.M. about the
abuse, including some in which C.M. denied being touched inappropriately.  Palmer also notes that the record does not
contain evidence of C.M.’s responses as they may have been noted by the
Angleton Police Department, Child Protective Services personnel, the Lake
Jackson Police Department, Texas Children’s Hospital, the Children’s Advocacy
Center, and UTMB.  These are matters that
Palmer explored at trial in order to attempt to undermine C.M.’s
credibility.  The jury was entitled to
decide whether and how to credit C.M.’s testimony.  We cannot substitute our judgment for that of
the jury.  Lancon, 253 S.W.3d at 705.

Palmer
also invites us to consider “the age and relationship of C.M. to the other
complaining witnesses.”  He suggests that
as the youngest of three sisters, C.M. “may desire only to be involved with her
sisters and the events that are currently circling around them.”  Palmer provides no legal authority for
disregarding C.M.’s testimony on this basis, and we decline to do so.  As a general rule, “[e]very person is
competent to be a witness except as otherwise provided” in the rules of
evidence.  Tex. R. Evid. 601(a). 
The rules of evidence specifically address child witnesses, and they
provide that children will be deemed incompetent to testify if “after being
examined by the court,” they “appear not to possess sufficient intellect to
relate transactions with respect to which they are interrogated.”  Id.
601(a)(2).  Assuming that she otherwise
satisfies the requirements for witness competency, there is nothing inherently
suspect about C.M.’s age, whether judged at the time of the alleged abuse or
the time of her testimony.  See, e.g., Reyna v. State, 797 S.W.2d 189, 192 (Tex. App.—Corpus Christi 1990,
no pet.) (four-year-old witness found competent to testify about sexual assault
when examination demonstrated she understood difference between lie and truth;
was able to testify to her name, age, and names of her siblings; and was able
to identify her uncle “as the man who put her hands on his genitals, which she
identified through the use of an anatomically correct doll”).  The trial court examined C.M.’s competency
outside the presence of the jury and before her testimony, and found her
competent without defense objection.  The
jury was aware of C.M.’s age and the interaction between her and her sisters as
it related to the allegations of abuse. 
It was the jury’s responsibility to pass on the facts, and we must give
due deference to its determinations in that regard.  See Lancon,
253 S.W.3d at 705.

2.       Testimony of family members.—Palmer argues that the jury must have
disbelieved C.M.’s mother (Jill) and sisters (L.G. and L.M.) because the jury
acquitted him of the charges pertaining to L.G. and L.M.  Palmer concludes that the remaining evidence
was insufficient to convict him of the charges pertaining to C.M.  The evidence on the charges pertaining to
L.G. and L.M. was qualitatively different from that pertaining to C.M.  We thus disagree with Palmer’s assessment of
the record that the jury could not have harbored reasonable doubt about the
charges involving L.G. and L.M., while finding the evidence sufficient to
support a conviction on charges involving C.M.

The
oldest sister, L.G., testified only reluctantly, and she did not know or
remember numerous details about her allegation of rape.  Dr. Lukefahr testified that he could not
exclude the possibility that the abnormality in L.G.’s examination was actually
a normal physical variation.  There were
factual inconsistencies among the medical records, L.G.’s testimony, and Jill’s
testimony pertaining to L.G.’s rape allegation and other events that L.G.
alleged transpired that night.  In
contrast, the social histories included in C.M.’s medical records were
consistent with her testimony about the abuse she alleged against Palmer.  

With
respect to the other sister, L.M., her testimony was brief and the context of
her allegation (i.e., that Palmer abused her once in the presence of C.M. and
then offered her cereal) was different from the context of C.M.’s alleged abuse
(i.e., that Palmer took her into a dark closet).  L.M.’s medical examination showed normal
findings.

The
testimony of the mother, Jill, mainly centered on L.G.’s outcry.  Although Jill testified that the single
alleged act of molestation of L.M. occurred while she was at work, she offered
no details about what had happened.  As
to the abuse allegedly committed against C.M., Jill offered no details and no
description of C.M.’s outcry.  Jill
described the perineal abnormality and said that C.M. had problems, but Jill
also testified that she did not know C.M. was being sexually abused.  Thus, while Jill’s testimony might have
supported L.G.’s and L.M.’s testimony, it did not reinforce C.M.’s testimony
about the specific acts of sexual abuse she said Palmer committed against her.

In
sum, the testimony from Jill and her three daughters was materially different
with respect to the separate charges involving each daughter.  The level of corroborating evidence was also
different with respect to the separate charges involving each daughter.  The fact that the jury acquitted Palmer on
charges relating to L.G. and L.M. does not necessarily mean that it concluded
those two complainants and their mother were not credible witnesses.  The jury could have found all of these
witnesses credible but been satisfied of guilt beyond a reasonable doubt only with
respect to C.M.  We need not speculate
about how the jury reached its conclusions; it is sufficient for us to observe
we have no basis to conclude that such a result was clearly wrong, manifestly
unjust, or against the great weight and preponderance of the evidence.  See Johnson,
23 S.W.3d at 11.

3.       Testimony of Dr. Lukefahr.—Dr. Lukefahr testified, without
defense objection, that he examined C.M. and his findings were consistent with
C.M.’s allegations against Palmer. 
C.M.’s medical examination showed not only healed penetrating trauma to
her perineal area, but also bruising on her leg and blunt trauma to her
hand.  

Palmer
contends that this testimony was neutral at best and does not support a
judgment of conviction.  Dr. Lukefahr did
concede that he relied on the history provided by C.M.’s mother.  However, his explanation of his findings with
respect to C.M.’s perineum could have been understood by the jury as a
meaningful corroboration of C.M.’s allegation. 
Dr. Lukefahr expressed informed skepticism that his observations of
abnormalities in C.M.’s perineal area had a natural explanation:

Q.      Is it possible for a girl to be born with some sort of
abnormality on her perineum?

A.      Yes.  There actually is a
fairly uncommon birth defect of that area that’s called a midline fusion
defect, but it appears very, very different from this.  And so, that in my judgment, this was
definitely not a midline fusion defect.  And
I really do not think that it was a birth defect or a normal variant of that
area.

Q.      Because you have never seen anything like that before?

A.      Well, not only have I never seen anything like it, but I have
never read about it in the medical literature, I have never had other heard
other professionals talk about it at our meetings, so forth.  It’s really just the one and only time I have
ever come across that finding.

In addition, Dr.
Lukefahr expressed an opinion that an accidental injury to that part of C.M.’s
body was unlikely:

Q.      So, the abnormal finding on [C.M.] on her perineum, do you have
an opinion as to how that could have been caused?

A.      Yes.  In my opinion, it
does most likely represent healed trauma. 
In other words, there was some sort of injury to that area that healed.  And as far as what produced the trauma, it really
isn’t possible to distinguish with certainty from the examination what the
object might have been that caused the injury, but it was some sort of
penetrating injury to her perineum.

Q.      When you say “penetrating injury,” is that a location on a
child’s body that could be done accidentally?

A.      I would say in this particular instance, it would be -- it’s
probably possible to do that, but it would be an exceedingly rare event because
the perineal body is so sheltered behind the surrounding soft tissues.  In other words, the -- especially the inner thighs.

Like, for instance, if a child
fell on something, it would be very unusual that the object that she fell on
would have bypassed all of her other tissues, her legs, her labia, everything
else and only impacted that one very small area.

Palmer is correct that it would have been possible
for the jury to view Dr. Lukefahr’s testimony as being only neutral as to
whether C.M. had been sexually abused. 
But that was not the only inference the jury could have drawn, and we
cannot conclude it would have been clearly wrong, manifestly unjust, or against the great weight
and preponderance of the evidence for the jury to have viewed this evidence as
corroborative of C.M.’s testimony.  See Johnson,
23 S.W.3d at 11.

4.       Defense evidence.—Palmer denied all allegations of
abuse, and his step-mother, Jenny, testified that she asked C.M. if Palmer had
touched her inappropriately and C.M. said, “No.”  C.M. also denied that Palmer abused her on
cross-examination, but on redirect examination she explained that she thought
she had to agree with the defense attorney. 
Thus, as often is the case in criminal prosecutions, there was directly
conflicting evidence on the core allegations involving C.M.  The jury was charged with determining what
testimony to believe and what testimony to reject, and we cannot say that the
great weight and preponderance of the objective evidence contradicts the jury’s
apparent determination that C.M.’s testimony was credible.  See
Lancon, 253 S.W.3d at 707.

5.       Length of jury deliberations.—Finally, we address Palmer’s
contention that our factual sufficiency review should consider that “[t]he
record indicates the jury struggled with the evidence for approximately 12
hours.”  Setting aside the fact that the
record tells us nothing about whether the jury “struggled” or anything else the
jury might have been doing in its private deliberations, Palmer offers no legal
authority for considering the length of jury deliberations as part of a factual
sufficiency review.  To the contrary, the
well-established precedents instruct us to conduct our review considering all
of the evidence in a neutral light.  See Ladd, 3 S.W.3d at 557.  The length of jury deliberations is not part
of the evidence to be considered in this analysis.

*        *        *

Logic
does not compel the conclusion that an acquittal on the charges relating to
L.G. and L.M. also required an acquittal on the charges relating to C.M.  The evidence supporting the charges relating
to C.M. is not so weak as to render the verdict clearly wrong and manifestly
unjust.  See Perez v. State, 113
S.W.3d at 838 (“The testimony of a child victim alone is sufficient to support
a conviction for aggravated sexual assault or indecency with a child.”).  Nor does our review of the record suggest
that the verdict is against the great weight and preponderance of the evidence.
 We hold that the evidence was factually
sufficient, and we overrule Palmer’s first issue.  

Limiting Cross-Examination of Witness
About Unrelated Prior Allegation of Abuse



Palmer’s Contentions

          In his second issue, Palmer contends
that the trial court violated his Sixth Amendment right to confront his accuser
by preventing him from cross-examining L.M. about a similar outcry she made
years before her outcry against Palmer. 
Palmer argues on appeal that the testimony he sought to elicit would
have supported his theory that Jill “coached her children to say [Palmer] had
sexually molested them,” and should have been admitted under both the
Confrontation Clause and the doctrine of chances.  Palmer further argues that the trial court’s
exclusion of his proffered evidence denied his constitutional right to present
a meaningful defense.

Bill of Exceptions

At
a hearing outside the presence of the jury, the trial court stated that it had
reviewed Smith County police department records relating to L.M.’s prior outcry
and relevant legal authority submitted by Palmer’s counsel.  The police records reviewed by the trial
court included results from polygraph tests administered to the complainants’
mother and her friend, Missy, whom L.M. had accused of molestation.  The polygraph results showed deception when Jill
denied coaching L.M. and deception when Missy denied touching L.M.’s
vagina.  The trial court stated:

I have informed [defense counsel] that I was not going
to allow him to question [L.M.] regarding that incident of Smith County.  The State objected to that testimony pursuant
to Rule 608(b).  And I have informed [defense
counsel] that I was not going to allow that testimony. 

 

Palmer’s
attorney made a bill of exception.  He
summarized L.M.’s trial testimony that Palmer put his finger “in her private”
while she was on her mother’s bed, clothed. 
According to L.M., C.M. was also in the room at the time, and it
happened only once.  Palmer’s counsel
then described the evidence he proposed to use to cross-examine L.M.:

In Defendant’s Exhibit No. 14, which was referred to
earlier, the Tyler, Texas, Police Case . . . in there [L.M.] is asked to tell
what this person called . . . Missy, did to her.  And in the report, not referred to by a number
but it’s her narrative typed out and she says that’s what Missy did to
her.  She was in Mommy’s room.  She was on Mommy’s bed.  She had all her clothes on.  Joe was in the room.  Missy was on the bed.  Missy put her finger in her privates, and it
happened only one time. 

 

In
addition, Palmer also introduced—for the bill of exception only—a transcript
from an earlier trial in which he cross-examined L.M. as to the matters he
sought to introduce in the 2007 trial. 
In the earlier trial, L.M. testified that she remembered a woman named
Missy who once put her hand in L.M.’s “private.”  L.M. testified that she was in her mother’s
room with Missy and a man named Joe. 
L.M. said that she was fully clothed and that it happened only
once.  

The
trial court asked Palmer’s attorney for what purpose the testimony was offered,
and he replied, “We are offering that because that testimony was denied, and offering
it under the Sixth Amendment to the U.S. Texas [sic] Constitution, the confrontation
clause, the right to put on a defense, as well as the Doctrine of
Chances.”  The State objected under Rule
of Evidence 608(b), arguing that Palmer was, in fact, offering the evidence to
impeach L.M.’s credibility.  The trial
court sustained the State’s objection, stating, “I’m going to find that it’s
being offered for impeachment, that there’s not been a threshold finding that
the allegations were false, and I am going to deny the request under Rule 608(b),
as well as Rule 403.”

Palmer’s
argument to the trial court focused entirely on the similarities between the
two outcries by L.M.  To the extent
Palmer suggests on appeal that he intended to use the excluded evidence in an
attempt to establish that Jill “coached her children to say [Palmer] had
sexually molested”—a purpose that arguably could have been permissible under
Rule 613(b) to establish motive or bias, see, e.g., Hammer v. State,
296 S.W.3d 555, 563 (Tex. Crim. App. 2009)—such an argument does not comport
with the objection at trial and accordingly has been waived.  See Tex. R. App. P. 33.1(a).

Standard of Review

          We review a trial court’s decision to
admit or exclude evidence under an abuse-of-discretion standard.   Weatherred v. State, 15 S.W.3d 540, 542
(Tex. Crim. App. 2000).  A trial court
abuses its discretion when its decision lies outside the zone of reasonable
disagreement.  Montgomery v. State, 810 S.W.2d 372, 391 (Tex. Crim. App.
1990).  We review the trial court’s
ruling in light of what was before the trial court when it ruled.  Weatherred,
15 S.W.3d at 542.  A trial court’s ruling
will be upheld if it is reasonably supported by the record and is correct under
any theory of law applicable to the case.  Willover
v. State, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002). 

The Confrontation Clause

“The
Sixth Amendment right to confront witnesses includes the right to cross-examine
witnesses to attack their general credibility or to show their possible bias,
self-interest, or motives in testifying.” 
Hammer, 296 S.W.3d at 561
(citing Davis v. Alaska, 415 U.S.
308, 316, 94 S. Ct. 1105, 1110 (1974)). 
This right, however, is not unbounded. 
The trial court may exercise its discretion to limit the scope and
extent of cross-examination to avoid harassment, prejudice, confusion of the
issues, endangering the witness, and the injection of cumulative or collateral
evidence.  Hammer, 296 S.W.3d at 561; Lopez
v. State, 18 S.W.3d 220, 222 (Tex. Crim. App. 2000).  Ordinarily, the right to cross-examine a
witness under the Sixth Amendment will not conflict with an accused’s rights
under the rules of evidence: “[g]enerally speaking, the Texas Rules of Evidence
permit the defendant to cross-examine a witness for his purported bias,
interest, and motive without undue limitation or arbitrary prohibition.”  Hammer,
296 S.W.3d at 563; Lopez, 18 S.W.3d
at 222–23.  However, the Confrontation
Clause will prevail where such a conflict arises.  See U.S. Const. art. VI, cl. 2; Tex. R. Evid. 101(c); Hammer, 296 S.W.3d at 561 & n.9; Lopez, 18 S.W.3d at 222–23.  

Rule of Evidence 608(b)

Rule
of Evidence 608(b) provides that “[s]pecific instances of the conduct of a
witness, for the purpose of attacking or supporting the witness’ credibility,
other than conviction of crime as provided in Rule 609, may not be inquired
into on cross-examination of the witness nor proved by extrinsic
evidence.”  Tex. R. Evid. 608(b). 
Palmer suggests that a prior outcry is a statement, not evidence of
“conduct” excluded by Rule 608(b).  This
argument is inconsistent with settled law. 
The Court of Criminal Appeals has addressed the question of whether
Rule 608(b) precludes a criminal defendant from cross-examining a
complainant about prior false allegations of abuse.  Lopez,
18 S.W.3d at 223–26.  In Lopez, the Court observed that other
states have created exceptions to permit the introduction of prior false
allegations despite otherwise applicable evidentiary bars, but the Court
declined to create such a per se exception in Texas, observing: 

Legal commentators have . . . recognized the
peculiarity of the sex-offense exception recognized in other states.  Professors Goode, Wellborn, and Sharlot point
out that this rule “cannot be easily squared with the dictates of Rule 608(b).  Typically, the probative value of such
evidence flows from the inference it raises as to the complainant’s propensity
to make false claims—precisely the type of inference proscribed by Rule
608(b).” 

 

Id. at 224–25 (quoting 1 Steven
Goode et al., Texas Practice: Guide to the Texas Rules of Evidence: Civil and
Criminal § 608.1 (2d ed. Supp. 1998)). 
Again addressing the admissibility of prior, purportedly false,
allegations of abuse, the Court of Criminal Appeals wrote:

The theory for admitting prior false accusations of
rape in a sex-offense prosecution is frequently analogized to Aesop’s story of
“The Boy Who Cried Wolf.”  A past false
accusation makes it more likely that the witness lacks credibility and thus
should not be believed concerning this accusation.  But in Aesop’s fable, there really was a wolf,
and it killed the sheep.  The moral of
that story was “Nobody believes a liar . . . even when he is telling the
truth.”  A criminal trial, however, is
designed to find the truth about a specific incident, not to decide whether
someone has lied in the past about the presence of wolves or about being raped.
 Prior false allegations of rape do not
tend to prove or disprove any of the elements of the charged sexual offense.

 

Hammer, 296 S.W.3d at 564 (footnotes
omitted).

We
hold that the trial court did not abuse its discretion in sustaining the
State’s Rule 608(b) objection to Palmer’s proffered evidence that L.M. had
previously made an allegation of sexual abuse similar to the one she made
against Palmer.  There was no showing
that the prior allegation of abuse was a false accusation.  In any case, such evidence was inadmissible
for the purpose of attacking L.M.’s general credibility.  See Tex. R. Evid. 608(b); Hammer, 296 S.W.3d at 564.  Furthermore, the exclusion of such evidence,
offered to attack the witness’s general credibility, did not violate the
Confrontation Clause.  See Hammer,
296 S.W.3d at 564–65 (citing Boggs v.
Collins, 226 F.3d 728, 739–40 (6th Cir. 2000); United States v. Bartlett, 856 F.2d 1071, 1089 (8th Cir. 1988); Hughes v. Raines, 641 F.2d 790, 792–93
(9th Cir. 1981); Adams v. Smith, 280
F. Supp. 2d 704, 714 (E.D. Mich. 2003)); see
also Davis v. Alaska, 415 U.S. 308, 321, 94 S. Ct. 1105, 1112–13 (1974) (“the
Court neither holds nor suggests that the Constitution confers a right in every
case to impeach the general credibility of a witness through cross-examination
about his past delinquency adjudications or criminal convictions”).

The Doctrine of Chances

Palmer
argues that the “doctrine of chances” applies to establish the relevance of
L.M.’s prior allegation of abuse, and the trial court’s exclusion of the
evidence necessary to cross-examine her on this point effectively denied him
the right to confront his accusers and present a meaningful defense.  The “doctrine of chances” is a legal theory
based on the concept of logical implausibility. 
See Fox v. State, 115 S.W.3d
550, 559 (Tex. App.—Houston [14th Dist.] 2002, pet. ref’d).  It provides that the more often unusual
events occur under the similar circumstances, the less likely is the unusual
event to be the true cause.  De La Paz v. State, 279 S.W.3d 336, 347
(Tex. Crim. App. 2009) (“The ‘doctrine of chances’ tells us that highly unusual
events are unlikely to repeat themselves inadvertently or by happenstance.”); Plante v. State, 692 S.W.2d 487, 491–92
(Tex. Crim. App. 1985).  It is “the
instinctive recognition of that logical process which eliminates the element of
innocent intent by multiplying instances of the same result until it is
perceived that this element cannot explain them all.”  Plante,
692 S.W.2d at 491–92 (quoting 2 James H.
Chadbourn, Wigmore on Evidence § 302 (1979)); see also Casey v. State,
215 S.W.3d 870, 881 (Tex. Crim. App. 2007); Daggett
v. State, 187 S.W.3d 444, 453 n.18 (Tex. Crim. App. 2005); Martin v. State, 173 S.W.3d 463, 467-68
(Tex. Crim. App. 2005). 

In
Texas, the doctrine of chances has most often been applied when the State
sought to introduce evidence of extraneous offenses to prove intent or to rebut
a defensive theory of like accident or mistake. 
See, e.g., Plante, 692 S.W.2d at 491–92; Morgan v. State, 692 S.W.2d 877, 882,
n.7 (Tex. Crim. App. 1985).  In Plante, the defendant-contractor
purchased adobe tile on credit and failed to pay for it.  Plante,
692 S.W.2d at 489–90.  The Texas Court of
Criminal Appeals held that evidence of other instances when the defendant
failed to pay for goods or services rendered on credit was admissible, under
the doctrine of chances, to show intent. 
Id. at 493 (“If a person
repeatedly fails to pay for items purchased on credit, we believe the natural
inference to be that he or she is seeking to obtain something for nothing.”).  In Morgan,
the defendant was charged with indecency with a child by contact.  Morgan,
692 S.W.2d at 878.  The evidence showed
that the defendant had briefly touched the child’s genital area while playing
with her, and the court of appeals concluded that this incident alone was
insufficient to prove the defendant’s intent to gratify himself.  Id.  The Texas Court of Criminal Appeals held that
evidence that the defendant had previously fondled the complainant and her
sister was admissible, under the doctrine of chances, to show that the charged
act was not accidental.  Id. at 881.

The
Fourteenth Court of Appeals applied the doctrine of chances to conclude that
certain defensive evidence regarding previous sexual assault accusations by a
complainant’s siblings was relevant and admissible.  Fox,
115 S.W.3d at 561.  Fox was accused of
sexually assaulting his two minor step-children and his biological
daughter.  Id. at 556–57.  A
consolidated trial led to an acquittal on the charges pertaining to one child
and a mistrial as to the others.  Id. at 557.  Fox was tried again on charges pertaining to
one child.  Id.  During the
guilt-innocence stage of the trial, Fox unsuccessfully sought to offer evidence
that two other children had made similar sexual abuse allegations on the same
day.  Id.  Fox contended that this evidence supported
his theory that the children’s mother had coached them to make false
allegations in order to gain leverage in a custody dispute.  Id.  The complainant accused Fox of molesting her
on a nearly daily basis, as she pretended to sleep on a creaky, metal bunk bed
she shared with her step-sisters.  Id. at 556.  She testified that her sisters never awoke
while Fox was molesting her.  Id.  

During
the punishment phase of trial, the complainant’s older sister testified that
she slept in the top bunk and that Fox frequently climbed into her bed and had
sexual intercourse with her while her sisters slept in the lower bunk.  Id.
at 557.  The court of appeals noted the
similarities in the sisters’ stories: the abuse occurred frequently, at night,
in a creaky bunk bed, while the other sisters slept.  Id. at
561.  The court in Fox thus relied on the combination of the similarity and the
implausibility of the sisters’ accusations to conclude that the evidence of
extraneous acts was relevant to the defendant’s theory that all three girls had
been coached to make false allegations, and thus should have been admitted.  Id.

Palmer’s
complaint on appeal is distinguishable from the circumstances presented in Fox. 
To the extent Palmer’s defense theory was that Jill coached both L.M.
and C.M., there is no logical connection between L.M.’s outcries and C.M.’s
outcry.  There is no apparent common
motive for Jill to have coached L.M. to accuse both Missy and Palmer of
fondling her and for Jill to have coached C.M. to accuse Palmer of multiple
acts of sexual assault.  Coaching by Jill
is one possible explanation for L.M.’s similar accusations, but by no means is
it the only possible explanation.  L.M.’s
two similar accusations simply lack the forceful logical connection to Palmer’s
convictions for sexually assaulting C.M. that are present in other doctrine-of-chances
cases.  See Plante, 692 S.W.2d at 492 (“‘Since it is the improbability of a
like result being repeated by mere chance that carries probative weight, the
essence of this probative effect is the likeness of the instance . . . .  In short, there must be a similarity in the
various instances in order to give them probative value.’”); Fox, 115 S.W.3d at 561 (relying on
implausibility of and similarity between outcries of complainant and siblings);
see also Dabney v. State, 816 S.W.2d
525, 528–29 (Tex. App.—Houston [1st Dist.] 1991, pet. ref’d) (holding that, in
prosecution for theft of real estate, trial court’s admission of evidence that
defendant had previously defaulted on 150 properties was proper under doctrine
of chances because it showed defendant’s intent). 

Even
if the evidence of L.M.’s prior outcry had been admitted, it only could have
been probative of a defense theory that L.M. had been coached to make false
accusations of sexual assault—not that C.M. had been coached.  Because Palmer was acquitted of the charges
that he sexually abused L.M., he was not harmed by the exclusion of this
evidence.  See Tex. R. App. P.
44.2(b).

In
any case, as noted above, Palmer did not offer the excluded evidence for the
purpose of establishing that Jill coached her daughters to make false
accusations of sexual abuse.  Although
that certainly was one of the themes of Palmer’s defense, that purpose was not
articulated to the trial court as the reason for offering the evidence of
L.M.’s prior accusation.  When Palmer’s
counsel made his bill of exception, he never stated that the excluded evidence
was being proffered to prove coaching by Jill to establish motive or bias or
for any other purpose.  The State’s
objection to the evidence was based on Rule 608(b), a rule that prohibits using
specific instances of the conduct of a witness to attack the credibility of the
witness.  The prosecutor stated: “It’s
the State’s impression this evidence is offered for nothing but the purpose of impeaching
the credibility of the witness, [L.M.] with a prior allegation of sexual assault
against someone else other than the defendant, and that only goes to impeach
her credibility which [Rule] 608(b) specifically keeps out.”  The trial court then asked Palmer’s counsel
whether he had any other argument, and defense counsel answered, “No, your
Honor.”  The trial court then sustained
the State’s objection, stating: “I’m going to find that it’s being offered for
impeachment, that there’s not been a threshold finding that the allegations
were false, and I am going to deny the request under Rule 608(b), as well as
Rule 403.”

Right to Present a Defense

Finally,
Palmer relies on the court-of-appeals opinion in his prior appeal, which stated
that the cross-examination of L.M. about the prior outcry was “vital to his
defense.”  Palmer I, 222 S.W.3d at 96. 
In a previous trial, Palmer was convicted of sexually assaulting
L.M.  Id.
at 93.  The trial court permitted him
to cross-examine L.M. about the earlier outcry but instructed the jury that it
must find beyond a reasonable doubt that the prior outcry was false before it
could be considered for impeachment.  Id. at 95.  On appeal, Palmer contested this jury
instruction.  Id. at 95.  The court of
appeals noted that “[a] defendant seeking to impeach a witness with evidence of
a previous false accusation against a third party must, as a threshold
evidentiary matter, produce evidence showing the prior accusation is actually
false.”  Id.  The court of appeals
concluded that the trial court in the prior trial found that prior outcry was
false when it admitted the evidence.  Id. 
The court of appeals held that the jury instruction deprived Palmer of
impeachment evidence that was “vital to his defense” because the jury’s
determination of L.M.’s credibility was necessary for a conviction.  Id. at
96.  Palmer
I was thus decided on the grounds that the truth or falsity of L.M.’s prior
outcry was a threshold admissibility question which the prior trial court had
resolved in favor of admissibility, and thus never should have been presented
to the jury.  Palmer was tried and
convicted of sexually assaulting L.M. in a trial with numerous testimonial
inconsistencies, no eyewitness testimony, and no supporting medical
evidence.  Id.  L.M.’s credibility was
central to Palmer’s conviction, and evidence of her character for truthfulness
was highly relevant.

This
appeal presents a different question. 
The jury in this consolidated trial acquitted Palmer on charges that he
sexually assaulted L.M.  L.M.’s
credibility was not crucial to the jury’s determination that Palmer sexually
assaulted C.M.  Moreover, in this trial,
the court excluded the evidence of the earlier outcry, specifically stating “there’s
not been a threshold finding that the allegations were false.”  Palmer’s proffered evidence did not establish
that Jill had coached any of her children, nor was it offered to show bias,
interest, or motive to fabricate.  See Hammer,
296 S.W.3d at 561 (citing Davis, 415
U.S. at 316, 94 S. Ct. at 1105).  Just as
“prior false allegations of rape do not tend to prove or disprove any of the
elements of the charged sexual offense,” prior allegations by L.M. that she was
sexually assaulted by another person cannot prove or disprove whether Palmer
committed the charged offenses against C.M. 
See Hammer, 296 S.W.3d at 564.

In
excluding the proffered evidence, the trial court relied on both
Rules 608(b) and 403, thus exercising its discretion to limit the scope
and extent of cross-examination by preventing the introduction of L.M.’s
testimony that she was the victim of sexual abuse not once but twice.  We conclude that this exercise of discretion
was within the zone of reasonable disagreement. 
See Montgomery, 810 S.W.2d at 391.

Palmer
argues that the exclusion of L.M.’s prior outcry violated his constitutional
rights by depriving him of a fair trial and his right to present a
defense.  In this regard, Palmer relies
upon Washington v. Texas, 388 U.S. 14,
87 S. Ct. 1920 (1967), Chambers v.
Mississippi, 410 U.S. 284, 93 S. Ct. 1038 (1973), Crane v. Kentucky, 476 U.S. 683, 106 S. Ct. 2142 (1986), and Olden v. Kentucky, 488 U.S. 227, 109 S.
Ct. 480 (1988).  None of these
authorities suggest that the application of Rule 608(b) in this case deprived
Palmer of his right to put on a defense or his right to a fair trial
generally.  See Washington, 388 U.S.
at 22, 87 S. Ct. at 1924–25 (Sixth Amendment precludes “arbitrary rules that
prevent whole categories of defense witnesses from testifying on the basis of a
priori categories that presume them unworthy of belief”); Chambers, 410 U.S. at 295, 302–03, 93 S. Ct. at 1045–46,
1049–50 (holding that under facts and circumstances of the particular case,
exclusion of certain hearsay and application of common-law “voucher” rule
deprived defendant of a fair trial, but also acknowledging “the right to confront
and to cross-examine is not absolute and may, in appropriate cases, bow to
accommodate other legitimate interests in the criminal trial process” and
holding does not “signal any diminution in the respect traditionally accorded
to the States in the establishment and implementation of their own criminal
trial rules and procedures”); Crane,
476 U.S. at 687, 106 S. Ct. at 2145 (exclusion of evidence bearing on the
voluntariness of confession violated defendant of right to a fair opportunity
to present a defense); Olden, 488
U.S. at 230–32, 109 S. Ct. at 482–83 (limitation of cross-examination of
complainant about motive to lie failed to accord proper weight to Sixth
Amendment right to confront witnesses). 
As discussed above, consistent with the Sixth Amendment, the rules of
evidence permit cross-examination of a witness about bias, interest, and motive
without undue limitation or arbitrary prohibition.  See Hammer,
296 S.W.3d at 561; Tex. R. Evid. 613(b).  Exclusion of evidence offered solely to
attack the witness’s general credibility, as Palmer sought to do, does not
violate the Confrontation Clause, see
Hammer, 296 S.W.3d at 564–65, or the
defendant’s right to present a defense, see,
e.g., United States v. Scheffer,
523 U.S. 303, 308, 118 S. Ct. 1261, 1264 (1998) (rules excluding evidence from
criminal trials do not abridge accused’s right to present defense so long as
they are not “arbitrary” or “disproportionate to the purposes they are designed
to serve,” i.e., when exclusion has infringed upon weighty interest of accused).

We
hold that the trial court did not abuse its discretion in excluding evidence of
L.M.’s earlier unrelated accusation of sexual abuse, and we overrule Palmer’s
second issue. 

Conclusion

 

          We affirm the judgment of
the trial court.

 

 

                                                          Michael
Massengale

                                                          Justice

 

Panel consists of
Justice Keyes, Sharp, and Massengale

Do not
publish.  Tex. R. App. P. 47.2(b).

 











[*]        Parts of the record show that this case
was tried in the 239th District Court of Brazoria County.  The judgment and other parts of the record
show that this case was tried in the 23rd District Court of Brazoria County.  No party has addressed this.  We presume the judgment is correct.  See
Light v. State, 15 S.W.3d 104, 107 (Tex. Crim. App. 2000) (“There is also a
presumption of regularity of the judgment and the proceedings absent a showing
to the contrary, and the burden is on the defendant to overcome this presumption.”).